**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION NO. #** |
| **v.** | **23-454-5** |
| **SAIKEEN DIXON** | |

**MEMORANDUM OPINION**

Defendant Saikeen Dixon ("Dixon") was indicted along with nine coconspirators for his alleged involvement in a series of thefts from tractor trailers in the Philadelphia area. He has been charged with: (1) one count of Conspiracy to Commit an Offense against the United States, 18 U.S.C. § 371; (2) one count of Hobbs Act Robbery, 18 U.S.C. §§ 1951(a) & 2; (3) five counts of theft from interstate shipment, 18 U.S.C. §§ 659 &2; (4) one count of possession of items from interstate shipment theft, *id.*; and, (5) two counts of theft of public money 18 U.S.C. §§ 641 & 2. Dixon has filed a Motion to Suppress Evidence that was obtained through the search of his cell phones. For the reasons that follow, Dixon's Motion shall be denied.

## I. BACKGROUND AND FINDINGS OF FACT

The warrant which Dixon challenges was obtained—through an affidavit testified to by FBI Special Agent Joseph Donahue ("Agent Donahue") and issued by Magistrate Judge Craig Straw—in the course of a separate investigation into the armed carjacking of a FedEx truck, *see United States v. Dixon*, 23-209-2. While investigators were reviewing Dixon's phones, they found messages, photographs, and videos relevant to the cargo theft conspiracy charged here. It is this cell phone search warrant which is the subject of Dixon's present motion.

Dixon points to a series of facts which, he argues, Agent Donahue knowingly or recklessly omitted from the warrant affidavit which were sufficient to create a false impression in

the mind of the magistrate, and, ultimately, undercut the finding of probable cause. Many of the statements referenced in the affidavit—and challenged by Dixon—were made by a government co-operator (hereinafter P.A.). Before getting into the specifics of the omissions, some background is warranted.

"[T]he essential findings on the record"—as testified to by Donahue in the affidavit and at the *Franks* hearing on this Motion are set forth below. *Franks v. Delaware*, 438 U.S. 154 (1978); Fed. R. Crim. P. 12(d)( Where factual issues bear on the resolution of a suppression motion, the court must "state its essential findings on the record.").

In the summer of 2022, Ronald Byrd ("Byrd"), a co-defendant in this matter, and others devised a scheme to receive large quantities of drugs by mail. Bryd knew of P.A., an individual he believed worked at FedEx, and contacted him to ask if he could retrieve a package from a FedEx truck in exchange for payment.

P.A., who had been fired from FedEx the previous fall for stealing packages, enlisted the help of a friend who still worked as a FedEx delivery driver. In mid-summer 2022, a test package was successfully stolen from the FedEx truck, and then, a short while later, Byrd again sought P.A.'s assistance to retrieve a package. But this time things did not go to plan. On the morning of the planned theft, P.A.'s FedEx contact called him and told him that his delivery route had changed. P.A. called and texted the replacement driver, J.H., before driving to Temple Hospital and waiting for him near the loading dock. When J.H. arrived, he refused to give P.A. the package.

Byrd and an accomplice also arrived at Temple Hospital in a black Jeep Trackhawk with tinted windows. When J.H. left the hospital to continue on his route, P.A. followed in his own vehicle, while Byrd and the other person followed in the Trackhawk. As the vehicles followed

the FedEx truck, P.A. received a FaceTime call from Ramon Hankins, an associate of Byrd, whom he knew as "Pop." P.A. could hear Hankins speaking on a second telephone with Byrd discussing a plan to carjack the FedEx truck. At some point, the Trackhawk pulled up next to P.A. Byrd, in the front passenger seat, flashed a gun and yelled at P.A. for not getting the package. P.A. did not get a good look at the driver and did not recognize him before they drove off.

After completing his route, J.H. began driving the FedEx truck back toward the distribution facility. When he was about a block away, the black Jeep Trackhawk approached. Byrd got out of the passenger side of the Trackhawk, pointed a black semiautomatic pistol at J.H., and approached the driver's side of the FedEx truck. J.H. fled through the passenger door. Byrd then climbed into the FedEx truck and drove off, parking it a short distance away. The Trackhawk, which had followed the truck, stopped nearby. The second individual, who was wearing a yellow shirt and a black balaclava, and who appeared to have been the driver of the Trackhawk, got out to help Byrd find the package. The two of them tried unsuccessfully to access the truck's cargo compartment before abandoning the truck on the side of the road. P.A. was identified and arrested by the Philadelphia Police later that night.

The night of P.A.'s arrest—August 10, 2022—officers conducted a videotaped interview of him in the cell booking room. P.A. told the police that he was trying to help another person, "Ty," obtain a package, although he did not know what it contained. P.A. described how Ty and another person followed the FedEx truck in a black Jeep. When asked to describe the second person, P.A. explained that he "wasn't paying attention to the guy" and that he had "never seen him before."

After P.A. decided to cooperate with police, he spoke with Detective Christopher

Maitland ("Detective Maitland"), Detective Andrew Gallagher ("Detective Gallagher") and others in a proffer session on September 23, 2022—a session that was not videotaped but memorialized in Detective Maitland's notes. Philadelphia police conducted a third interview of P.A., which was also videotaped, on October 21, 2022.

When the FBI took over the investigation of the FedEx carjacking in late winter 2022 to early spring 2023, Agent Donahue was assigned as the lead case agent. He conducted a proffer interview with P.A. on April 6, 2023, in which P.A. gave a detailed accounting of the lead-up to, events of, and aftermath of the August 2022 carjacking. During that session, P.A. was shown—for the first time—a still image from the FedEx security footage. He told investigators that the previously unidentified carjacker looked like someone he knew as "SK." Agent Donahue, noticing that of Byrd's known associates, Dixon's first name, "Saikeen," had "S" and "K" as prominent syllables, showed P.A. a driver's license photo of Dixon. P.A. confirmed the photo was of "SK."

In seeking the warrant to search Dixon's four cell phones, Agent Donahue described the basic contours of the scheme and the events leading up to the carjacking, as well as P.A.'s identification of Dixon as "SK." He did not, however, include everything known to investigators. Dixon's *Franks*' Motion is premised on the following omissions: (1) P.A.'s inability, on August 10, 2022, to identify the driver of the Trackhawk; (2) P.A.'s initial "lie" to investigators identifying Byrd as "Ty;" (3) P.A.'s October 21, 2022[1] statement that he did not know who was driving the Trackhawk; (4) Detective Maitland's notes from the September 2022 proffer, which indicate that P.A. placed Pop in the Trackhawk with Byrd; (5) Detective

---

[1] Dixon repeatedly attributes this statement to the September 2022 proffer session. Since it was, however, the October 21, 2022 statement that was videotaped and was introduced at the hearing, the Court assumes that Dixon intended to refer to statements made during the October 21 interview.

Gallagher's notes "Byrd and Pop together in the Trackhawk" from the October 2022 interview; (6) P.A. was a thief—he was twice fired from FedEx for stealing packages to support his drug habit; (7) P.A.'s May 2023 grand jury testimony, in which he again stated that he could not see who was with Byrd in the Trackhawk; (8) any mention of "Pop" as a participant in the scheme; (9) Agent Donahue's failure to corroborate P.A.'s familiarity with SK; and, (10) Dixon's nonresponse to Byrd's text message and the fact that Dixon lived "near" Temple Hospital.

## II. LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. amend. IV, and provides that "no Warrant shall issue, but upon probable cause, supported by Oath or affirmation," *id.* Criminal defendants have the right to challenge the statements within the affidavit submitted in support of the issuance of a warrant. *United States v. Yusuf,* 461 F.3d 374, 383 (3d Cir. 2006). Although a probable cause affidavit is afforded a presumption of validity, if the defendant makes a "substantial preliminary showing" that the affidavit contained false statements sufficient to undermine probable cause, they are entitled to an evidentiary hearing and given the opportunity to rebut that presumption. *Id.* (citing *Franks*, 438 U.S. at 171).

At the evidentiary hearing, in order to justify suppression, the Defendant must establish by a preponderance of the evidence that: (1) "the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and[,] (2) that such statements or omissions were material, or necessary, to the probable cause determination." *Id.* (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)). Only if the Defendant meets this burden as to both elements does the Fourth Amendment require the suppression of evidence found in that search. *United States v. Frost*, 999 F.2d 737, 742-43 (3d Cir. 1993).

## III. DISCUSSION

### A. *Franks* Element I: Deliberate or Reckless Falsity

The first prong of the *Franks* test asks whether "the affiant acted deliberately to conceal the truth or with 'reckless disregard for the truth.'" *United States v. Williams*, 974 F.3d 320, 353 (3d Cir. 2020) (quoting *Franks*, 438 U.S. at 171). As outlined above, Dixon has raised ten facts which he argues Agent Donahue omitted from his affidavit either in a deliberate attempt to keep them from the magistrate or with reckless disregard for whether their omission rendered the affidavit misleading.

#### *i. Deliberate Concealment*

"Whether something is done deliberately is a straightforward question of fact." *Reedy v. Evanson*, 615 F.3d 197, 213 (3d Cir. 2013). As a preliminary matter, the Court finds that Agent Donahue did not act with a deliberate attempt to conceal the truth from the magistrate. His testimony was forthright, consistent, and credible in all respects, and reflected his effort to present corroborated information and the facts most relevant to Dixon's involvement. Yet the inquiry does not end there. *United States v. Brown*, 631 F.3d 638, 642 (3d Cir. 2011). Although "under *Franks* the more egregiously impermissible state of mind is 'knowingly and intentionally,'" *id.* at 645, n.7 (quoting *Franks*, 438 U.S. at 155), the question here remains: in omitting this information did Agent Donahue display a reckless disregard for the truth? *See Brown*, 631 F.3d at 642 (3d Cir. 2011) (noting that officers had not acted knowingly and intentionally and that "[t]he only question" was whether the conduct displayed a reckless disregard for the truth).

#### *ii. Reckless Disregard for the Truth*

"To know whether something is done with "reckless disregard" for the truth requires some explanation of the meaning of that term," *Reedy*, 615 F.3d at 213, and requires a showing

of more than mere "negligence or innocent mistake." *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000) (quoting *United States v. Davis,* 617 F.2d 677, 694 (D.C. Cir. 1979)). An omission is made with reckless disregard if an officer "withheld 'a fact in his ken that any reasonable person would have known that this was the kind of thing the judge would wish to know.'" *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 471 (3d Cir. 2016) (quoting *Wilson*, 212 F.3d at 788). Inherent in this question is: (i) whether the affiant had knowledge of the omitted information; and, (ii) whether the information is "the kind of thing the judge would wish to know"—*i.e.*, whether it has some relevance to probable cause. *Id*.

a. Knowledge

Because an affiant cannot recklessly withhold information that was not known to him, a threshold question is whether the affiant was actually aware of the omitted information. "[K]nowledge of the information alleged to have been recklessly omitted" is "inherent in this inquiry." *Dempsey*, 834 F.3d at 471; *see also United States v. Rivera*, 347 F. App'x 833, 835 (3d Cir. 2009) ("An omission is made if an affiant withholds a fact within his knowledge. . . ."); *United States v. Lucidonio*, 592 F. Supp.3d 381, 389 (E.D. Pa. 2022) (explaining that, for an alleged *Franks* omission, the court first asks whether the affiant "actually had knowledge of the information allegedly omitted" when he swore the affidavit).

Here, Agent Donahue testified at the *Franks* Hearing that when he swore the affidavit he was unaware of several of the facts that Dixon points to as omissions. Specifically, he did not know of: (1) the apparent inconsistency in P.A.'s statements, as reflected in Detective Maitland's notes from the September 2022 proffer; (2) the contents of Detective Gallagher's notes from the October 2022 interview; (3) the substance of P.A.'s grand jury testimony; (4) the extent of P.A.'s drug use; or, (5) how P.A. knew "SK."

*1. Detective Maitland's Notes*

Addressing first Detective Maitland's notes from the September 23, 2022 proffer session,[2] Dixon argues that these notes are exculpatory because they place "Pop," not Dixon, in the Trackhawk with Byrd. This is different from what P.A. stated in his other interviews, namely that he did not get a good look at the second person in the Trackhawk and that Pop was on the phone, not physically present. Dixon argues that since Agent Donahue testified that he reviewed the Philadelphia Police Department file when he was assigned to the case, he should have been familiar with the contents of these notes—and recognized the inconsistency contained therein—when he applied for the warrant.

Yet Agent Donahue testified that, although these typewritten notes were turned over to the FBI along with the rest of the Philadelphia Police Department's investigative file, he did not review them until December 2023, approximately two months after the warrant. When he did, he recognized the incongruity—that they indicated that P.A. placed Pop, not Dixon, in the Trackhawk with Byrd—and followed up with Detective Maitland, a conversation he documented in a contemporaneous 302.[3] Because Agent Donahue had no knowledge of these notes at the time he swore the affidavit, he could not have recklessly omitted the information they contained. *See Dempsey*, 834 F.3d at 471.

*2. Detective Gallagher's Notes*

Dixon next argues that Detective Gallagher's handwritten notes from the October 21,

---

[2] These notes indicate that P.A. told Philadelphia police officers that, when the Jeep Trackhawk pulled up and P.A. encountered the two carjackers, "'Bird' was driving the black Jeep with 'Pop' now in the front passenger seat. . . . Bird and Pop followed the FedEx vehicle to Shriners in the Jeep."

[3] An FBI FD-302 report ("302"), is the form FBI agents use to memorialize information obtained during interviews and other investigative activity.

2022 interview with P.A.—stating "Byrd and Pop together in the Trackhawk" [4]—are likewise exculpatory because they identify Pop as a possible alternative suspect for the second carjacker. But unlike Detective Maitland's notes, this document was not turned over to the FBI with the investigative file. Instead, the FBI received a recording of the interview itself. Dixon nonetheless argues that Agent Donahue was reckless in not recognizing these notes as exculpatory because the investigative team overall had knowledge of them.

For the same reason as discussed above, Dixon's argument here is also unavailing. Agent Donahue was unaware of what these notes contained. They were neither in FBI's possession as of the date of the affidavit, nor had they been reviewed by him. Accordingly, Agent Donahue's omission of the information contained therein—information that he did not know—cannot amount to reckless disregard for the truth. *Id*.

*3. P.A.'s Grand Jury Testimony*

Dixon next argues that Agent Donahue omitted that, in P.A.'s May 2023 testimony before the grand jury, P.A. identified Byrd but stated that he could not see the driver of the Trackhawk. Dixon maintains that this is exculpatory because it "contradict[s] his earlier photo identification." But once again the evidence here established that Agent Donahue neither reviewed P.A.'s grand jury testimony nor otherwise learned what P.A. had said there before swearing the affidavit.[5] Nonetheless, Dixon contends that even if Agent Donahue did not review the testimony before swearing the affidavit, he had a responsibility to know what was said.

---

[4] This appears to be a misunderstanding by Detective Gallagher. In the video recording of this interview, which was played, in part at the *Franks* hearing, P.A. never actually places "Byrd and Pop together in the Trackhawk." Instead, P.A. twice said he could not see the driver, and that Pop was not, in fact, in the Trackhawk, but appeared to be home in bed.

[5] The record is not clear as to *why* Agent Donahue did not review this testimony. Notably, however, P.A. only testified in connection with the indictment charging Bryd. He did not testify with respect to the superseding indictment that also charged Dixon.

Yet, *Franks* and its progeny impose no such obligation and do not convert a failure to uncover information into reckless concealment. *See Brown*, 631 F.3d at 648 (quoting *United States v. Dale,* 991 F.2d 819, 844 (D.C. Cir. 1993)) ("It is clear that, 'in general, the failure to investigate fully is not evidence of an affiant's reckless disregard for the truth.'"). The inquiry into a claimed omission turns on information actually known to the officer responsible for the affidavit—information intentionally or recklessly concealed from the magistrate—not what the agent might have discovered had he reviewed every investigative or prosecutorial record bearing on the case. *See Dempsey*, 834 F.3d at 471.

*4. P.A.'s Drug Abuse*

Turning to Dixon's argument that Agent Donahue omitted information about P.A.'s drug addiction, Dixon argues that this information is "inherently important" to P.A.'s "credibility as well as his ability to see and recall details while sober." Agent Donahue testified that he knew that P.A. had used drugs in the past, specifically that he had taken a Percocet after the carjacking and that he had smoked marijuana in the past. But he did not learn that P.A. was an addict until the fall of 2024—more than a year after the affidavit was submitted. When he later learned this information, he documented it in a contemporaneous 302. Dixon does not seem to contest that Agent Donahue did not know the extent of P.A.'s addiction but instead faults him for knowing that P.A. had some history of drug use, but not asking follow up questions until later.

But once again, without Agent Donahue's knowledge of the underlying "omitted" fact, Dixon did not meet his burden to show that this omission was made recklessly. *Id.* At most, Dixon has identified an avenue of investigation that Agent Donahue could have pursued before applying for the warrant, but his failure to do so does not, without more, establish a reckless disregard for the truth. *See Brown*, 631 F.3d at 648; *see also United States v. Larnerd*, 2025 WL

2630730, at *2-3 (3d Cir. Sept. 12, 2025) (nonprecedential) (rejecting a *Franks* argument that an officer should have investigated a witness's background more extensively before relying on her account).

*5. Corroboration P.A.'s Familiarity with SK*

Dixon next faults Agent Donahue for failing to investigate and explain the basis for P.A.'s familiarity with "SK." According to Dixon, by reporting the photo identification without explaining the background, the affidavit "create[ed] the impression for Magistrate Judge Straw that [P.A.] must have known Dixon prior to the carjacking."[6] But Dixon does not identify any particular omission from the affidavit. Instead, he seems to argue that because "Agent Donahue gathered almost no evidence" supporting the inference that P.A. knew SK, it was reckless for Agent Donahue to include the photo identification at all.

As an initial matter, if Agent Donahue did not know how familiar P.A. was with SK, there is no information for him to have recklessly omitted. *See Dempsey*, 834 F.3d at 471. Insofar as Dixon is instead arguing that it was reckless to submit the affidavit without asking how P.A. knew Dixon, how many times he had seen Dixon before, *et cetera*, "[w]hether the FBI could have provided more information is not the benchmark." *United States v. Shields*, 458 F.3d 269, 280 (3d Cir. 2006). Agent Donahue had no obligation to "investigate fully," *Brown*, 631 F.3d at 648, the relationship between P.A. and SK before stating what he did in the affidavit. He did not invent the identification nor embellish what P.A. said. P.A. volunteered the name "SK" when he was shown the photo of the carjackers, it was not suggested to him. And he later provided "SK's" Instagram handle to investigators. In his affidavit, Agent Donahue did not report

[6] Notably, Dixon does not argue that the affidavit created a *false* impression that P.A. knew "SK"; he argues only that Agent Donahue did not include sufficient evidence to support that inference. *Franks*, however, is concerned with deliberate or reckless falsehoods, not with whether every inference arising from an affidavit is supported by the quantum of corroboration a defendant would prefer. *See Shields*, 458 F.3d at 280.

anything that did not happen: rather, he accurately relayed the identification P.A. actually made.

b. Relevance to Probable Cause

The remaining facts raised by Dixon in challenging the warrant are: (1) that P.A. was a "thief;" (2) that "Pop" participated in the scheme; (3) P.A.'s initial false identification of Byrd as "Ty"; (4) possible innocent explanations for Dixon's text messages and cell-site data; and, (5) P.A.'s persistent inability to identify the driver of the Trackhawk. In that each was indisputably known to Agent Donahue when he swore the affidavit, the question of whether he recklessly omitted them turns on whether "any reasonable person" would recognize them as "the kind of thing the judge would wish to know." *Dempsey*, 834 F.3d at 471. For an omission to be reckless, the information must "bear[] on probable cause such that it should be presented to the magistrate." *Id*. at n.9.

That standard reflects two competing principles. On the one hand, an "officer cannot make unilateral decisions about the materiality of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence." *Wilson*, 212 F.3d at 787. The probable cause determination belongs to the neutral magistrate, not the investigating officer. *Dempsey*, 834 F.3d at 471 & n.9; *see also Kendig*, 173 F.4th at 472. On the other hand, "[a]ll storytelling involves an element of selectivity," *Wilson*, 212 F.3d at 787, and an affiant therefore need not "tell all." *Kendig v. Stolar*, 173 F.4th 466, 472 (3d Cir. 2026). *Franks* does not require an officer to recount "the entire history of events leading up to a warrant application with every potentially evocative detail," *Wilson*, 212 F.3d at 787, or to include every piece of evidence that bears in some way on every point in the affidavit, *see Kendig*, 173 F.4th at 472 (citing *Dempsey*, 834 F.3d at 474).

*Wilson v. Russo* illustrates this distinction. 212 F.3d 781. There, the Third Circuit considered a number of omissions the officer made in his warrant application. Although it found

that it was reckless to omit facts that directly bore on whether the suspect was the perpetrator—specifically that an eyewitness had failed to identify the suspect in a photo array, as well as the substantial discrepancy (four to six inches) between the suspect's height and another eyewitness's description—it was not reckless to omit more peripheral details, including seeming ethnic differences between the suspect and the others in the photo array. *Id.* at 788. Nor was it reckless to omit that height and weight information was not listed in the photo array because that fact "is so routine as to be unremarkable to a judge." *Id.* "Although these latter facts could be used for impeachment at trial, a police officer cannot be expected to present a judge with complete background." *Id.*

The lesson of *Wilson* is that *Franks* requires inclusion of information that bears on the magistrate's probable cause determination, not every fact that might later furnish fodder for impeachment or permit a competing inference. It is through this lens that the remaining omissions must be evaluated.

*1. P.A. was a "Thief"*

Dixon argues that Agent Donahue omitted a material fact from the affidavit by failing to characterize P.A. as a thief and a drug addict. Although the affidavit does disclose that P.A. had been fired from FedEx, and that P.A. concealed this from Byrd, Dixon argues that the additional information—that P.A. had been fired for stealing packages and that he abused drugs—is "inherently important" because it both bears on P.A.'s credibility and his ability to perceive and recall details.

As addressed above, Agent Donahue was not aware of the extent of P.A.'s drug use, and so the exclusion of that information was not reckless. Nor is the additional information about P.A.'s previous thefts from FedEx the "kind of thing the judge would wish to know." *Dempsey*,

834 F.3d 457, 471. An affiant is not required to "include every single piece of evidence for every single point," *Kendig*, 173 F.4th at 473, and it is often "appropriate" and even "desirable" for an affidavit to provide a "distilled version" of the circumstances rather than recount them in their entirety. *Dempsey*, 834 F.3d at 471 n.10. The affidavit here already described in considerable detail P.A.'s participation in two efforts to steal packages from FedEx: (1) the successful theft in mid-summer 2022; and, (2) the unsuccessful attempt a short while later, which precipitated the carjacking. It acknowledges P.A.'s central role in the scheme, detailing how P.A. contacted a former FedEx coworker and coordinated with Byrd to intercept these packages. The affidavit did not present P.A. as an uninvolved—or unimpeachable—witness. To the contrary, it squarely disclosed his active participation in a scheme involving the theft of packages entrusted to FedEx.

Against that backdrop, the additional fact that P.A. had stolen packages on other occasions adds little to the credibility analysis. *See United States v. Summage*, 575 F.3d 864, 874 (8th Cir. 2009) (rejecting a *Franks* challenge where the affidavit disclosed that a witness was mentally handicapped and additional reliability information "would add very little to the court's ability to assess [the witness's] credibility"). Because the affidavit already supplied the facts necessary for the magistrate to assess P.A.'s willingness to steal and what that conduct meant for his credibility, the omission of additional instances of similar misconduct did not amount to reckless disregard for the truth.

*2. False Identification of "Ty"*

Relatedly, Dixon argues that P.A.'s initial false identification of the armed carjacker as "Ty"—a statement that P.A. later admitted was not true—should have been included in the affidavit because it "established the fact that [P.A.] knowingly lied to law enforcement about the identity of at least one perpetrator."

*Franks* does not ask whether an informant has ever lied. 438 U.S. at 171 ("The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant."). The question is whether the affiant knew of and recklessly disregarded that untruthfulness in a way that rendered the affiant's own representations false or misleading. *Brown*, 3 F.3d at 677-78. Here, there is no dispute that Agent Donahue knew of P.A.'s initial lie to investigators. Indeed, he disclosed the fact in earlier affidavits, particularly those concerning Byrd, the subject of the misidentification. Yet he omitted the information from *this* affidavit. Agent Donahue testified that he made this edit in an effort to streamline the facts to present only the most relevant, corroborated information to the magistrate.

Once again, however, because the affidavit contains ample information for the magistrate to evaluate P.A.'s credibility and motive to lie, its omission was not reckless. To be sure, other circuits have found reckless disregard where an affiant omitted all known information undermining the credibility of a critical informant. *See United States v. Glover*, 755 F.3d 811, 817 (7th Cir. 2014) ("the complete omission of known, highly relevant, and damaging information about [the informant's] credibility . . . impaired the neutral role of the magistrate deciding whether to issue the warrant"); *United States v. Lull*, 824 F.3d 109, 117 (4th Cir. 2016) (finding reckless disregard where trustworthiness of the informant was at the heart of the reliability determination and affidavit contained no statements concerning the informant's credibility). But unlike *Glover*, the case Dixon relies on in his Motion to Suppress, here, as stated earlier, the affidavit does not paint P.A. as an unimpeachable witness. It detailed: (1) P.A.'s role in coordinating the successful July 2022 theft of a FedEx package; (2) his participation in the unsuccessful August 2022 effort to steal the package containing more than

nine kilograms of cocaine; (3) his attempt to bribe the FedEx driver with $5,000 in exchange for that package; (4) his arrest; (5) guilty plea; and, (6) cooperation with investigators. Because this affidavit contained "significant details bearing upon the informants' credibility that buffers the omissions," *United States v. Lucidonio*, 592 F. Supp.3d at 389, the exclusion of this one additional instance of dishonesty did not create a false or misleading impression of P.A.'s character for truthfulness. The magistrate was given ample reason to scrutinize P.A.'s credibility, and the omission does not evince a reckless disregard for the truth.

*3. Pop*

Dixon identifies, as another purported omission, the affidavit's failure to mention Pop in the affidavit at all. His argument is that, because P.A. identified Pop as a participant in the carjacking—and potentially as an alternative suspect—Agent Donahue's omission of that information effectively "hid critical facts about the carjacking and its participants from Judge Straw." But the premise of Dixon's argument is difficult to square with the record. Whatever significance investigators initially placed on P.A.'s reference to "Pop," Hankins did not match the physical characteristics of the carjacker. Most notably, Hankins's skin tone, height, and weight varied significantly from the person in the FedEx security video. "Pop," as Agent Donahue testified, was not an obvious alternative suspect whose existence undercut the identification of Dixon or the probable-cause showing presented in the affidavit. Nor did P.A.'s reference to Pop as a coconspirator in the scheme necessarily exclude Dixon as a participant. In these circumstances, the information did not bear on probable cause in a way that would make it "the kind of thing the judge would wish to know." *Dempsey*, 834 F.3d at 471.

*4. Dixon's Text Messages and Cell Site Data*

The next omission relates to the text message with Byrd's location that Byrd sent to

Dixon's phone around one hour before the carjacking and the subsequent cell-site location evidence placing Dixon's phone[7] in the vicinity of Temple Hospital. Dixon argues that Agent Donahue, by failing to explain that: (1) Dixon did not respond to the text message; and, (2) that there could be an innocent explanation for Dixon's presence near Temple Hospital, he concealed this information from the magistrate.

However, the absence of an explicit statement to this effect—that investigators had no evidence Dixon read or responded to Byrd's message and that Dixon lived "near" Temple Hospital—is not the kind of thing that must be included in a warrant. *See District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018) ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts. . . . [T]he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." (internal quotation omitted)).

The affidavit plainly states only what the investigation uncovered—that Byrd sent a text message with his location to Dixon shortly before the carjacking and shortly thereafter, cell site data placed Dixon's phone at Temple Hospital. It does not create a false impression or imply that Dixon replied, acknowledged the message, or otherwise engaged in a conversation with Byrd, nor did it rely on any such assumption to support probable cause. The additional point that investigators had no evidence of a response is therefore not a fact that would have altered the magistrate's understanding of the evidence that *was* presented.

Same with the purported "innocent explanation" of why Dixon might be in the vicinity of

[7] Dixon additionally argues that the affidavit, in saying that Dixon and not "Dixon's phone" was near Temple Hospital was an inaccuracy. But it is reasonably understood by judicial officers, that cell-site location information provides the location of a phone and there is an inference that the phone is in the possession of its owner. *Carpenter v. United States*, 595 U.S. 296, 311-12 (2018); *see also United States v. Wilson*, 960 F.3d 136 (3d Cir. 2020) (describing cell-site location data as placing the defendant at the scene of a robbery).

Temple Hospital.[8] *Franks* does not require an affiant to catalog every investigative dead end or every item of evidence investigators failed to uncover, nor does probable cause require officers to negate every innocent explanation for suspicious circumstances before presenting them to a magistrate. *See Kendig*, 173 F.4th at 473; *Wesby*, 583 U.S. at 61. Accordingly, neither the absence of evidence that Dixon read or responded to Byrd's message nor the failure to articulate an innocent explanation for Dixon's proximity to Temple Hospital constitutes the type of omitted information that a judge would want to know.

*5. Driver of the Trackhawk*

Finally, Dixon has offered, in total, three omissions corresponding to three occasions on which P.A. was asked about the identity of the driver of the Jeep Trackhawk and was unable to provide an answer. Specifically, Dixon cites: (1) P.A.'s initial statement on the night of his arrest, August 10, 2022, in which P.A. told police officers "I never saw him before" and "I wasn't really paying attention to the guy;" (2) the October 21, 2022 interview, in which P.A. twice stated "I don't know who the driver was" and, was unable to describe him beyond stating that he was a Black man in his mid-thirties; and, (3) P.A.'s May 10, 2023 grand jury testimony when he answered "no" when asked whether he could see who Byrd was with. Although, as explained above, Agent Donahue had no actual knowledge of P.A.'s grand jury testimony, due to its relevance to the tension between P.A.'s inability to recognize and remember the driver and the subsequent photo identification, it is worth discussing here as well. Dixon argues that these three purported "failed identifications"—both before and after the April 2023 proffer—render suspect the photo identification by P.A. that *was* included.

[8] The government also points out that not only was Dixon's address actually included in the affidavit in quoted text messages, so this information was not, in fact, omitted, but the cell towers that service his home address are not the same ones covering Temple Hospital.

To be sure, when an eyewitness identifies a suspect, omitting an earlier failed identification procedure may be reckless because it can cause the magistrate to overweigh the identification that is included. *See, e.g.*, *Wilson*, 212 F.3d at 788 (finding reckless the omission of an eyewitness's failure to identify the suspect from a photo array). But Dixon's characterization of P.A.'s earlier statements as "failed identifications" overstates what actually occurred. P.A. did not fail to pick Dixon out of a lineup or photo array of potential carjackers. Nor did he ever say that he recognized or remembered the driver of the Trackhawk or say that he saw Dixon in that Jeep. Rather, when asked if he saw the second person in the Trackhawk, P.A. consistently explained—even after his April 2023 proffer—that he had not been paying attention to that person, had not gotten a good look at him, and therefore did not know who he was. *Cf. United States v. Savage*, 85 F.4th 102, 126 (3d Cir. 2023) (affirming denial of *Franks* motion where eyewitness knew the defendant but did not recognize the shooter and the warrant application did not identify the defendant as the shooter).

The circumstances readily explain that limited recollection. The Trackhawk had tinted windows, and P.A.'s opportunity to observe its driver, when it pulled alongside his car, was brief and obstructed. P.A.'s attention was fixed on Byrd, who was threatening him with a gun, and he retained no more than general impressions of the second person's race and age. Indeed, P.A. failed to recall even the driver's bright yellow shirt, underscoring how little attention he directed toward him. The conditions of the photo identification, however, were materially different. The first time P.A. was shown a still image from the FedEx surveillance footage, during the April 2023 proffer, P.A. stated that the person pictured looked like someone he knew as "SK." That identification did not depend on P.A.'s ability to reconstruct the events of August 10, 2022 from memory. It rested instead on his independent familiarity with "SK," applied to a photograph he

could examine deliberately and without the stress, distraction, or limited vantage point of the armed encounter. Fundamentally, P.A.'s memory—or lack thereof—of the driver of the Trackhawk has no bearing on his ability to later recognize an acquaintance when shown a photograph.

It also bears noting that Agent Donahue did not simply accept P.A.'s identification of "SK," at face value, but took additional investigative steps to corroborate the information, all of which supported P.A.'s identification. Agent Donahue compared the image from the FedEx security footage with pictures on Dixon's Instagram account. He obtained text messages from Byrd's phone in which Byrd—shortly before the carjacking—sent his location to Dixon. And he got a warrant for Dixon's cell-site information which indicated that Dixon (or rather Dixon's phone), in fact, went to Temple Hospital after receiving Byrd's text. Given that corroboration, P.A.'s earlier inability to recognize or remember the second carjacker was not so obviously critical to evaluating the later photo identification that any reasonable affiant would have known the magistrate would wish to know it, *Dempsey*, 834 F.3d at 471, and its omission was not made with a reckless disregard for the truth.

**B. *Franks* Element II: Probable Cause**

Although Dixon has not carried his burden under the first *Franks* prong, materiality will nevertheless be addressed to ensure that his challenge receives full consideration. Yet, the same result is achieved. Even assuming all the challenged omissions should have been included, they would not have defeated probable cause.

To assess materiality, the affidavit must be reconstructed, excising any false statements, and "remov[ing] the 'falsehood created by an omission by supplying the omitted information to

the original affidavit.'"[9] *Yusuf*, 461 F.3d at 384 (quoting *Sherwood*, 113 F.3d at 400); *see also Wilson,* 212 F.3d at 789 (describing the undertaking as "the reconstructive surgery required by our jurisprudence"). It is only if probable cause does not exist under the reconstructed affidavit that suppression follows. *Yusuf*, 461 F.3d at 383; *see also Frost,* 999 F.2d at 743 ("[W]here an omission, rather than a misrepresentation, is the basis for the challenge to the affidavit, a court should ask whether the affidavit would have provided probable cause if it had contained a disclosure of the omitted information.").

Probable cause is a "fluid concept" that turns on "the assessment of probabilities in particular factual contexts," *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. at 232), and requires only a "fair probability" that evidence of a crime will be found in the place to be searched, *id.* (quoting *Gates*, 462 U.S. at 238). The facts must be considered collectively, and even facts that when considered alone could have an innocent explanation may acquire additional significance when viewed as a whole. *Wesby*, 583 U.S. at 60-61 (citation omitted). Probable cause, after all, turns on the "whole picture," in which "the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *Id.; see also Cummings v. City of Philadelphia*, 137 Fed. App'x 504, 506 (3d Cir. 2005) ("In assessing whether probable cause exists, the inculpatory evidence should be weighed against the exculpatory evidence to determine whether a reasonable person would believe an offense has been committed by the suspect.").

The reconstructed paragraphs are as follows.

---

[9] Because the complete affidavit is quite lengthy, the Court reconstructs only the paragraphs relevant to Dixon's challenges. *See Dempsey,* 834 F.3d at 470 n.8 (recognizing an exception to the ordinary word-by-word reconstruction requirement where an affidavit is of "extraordinary length" and a complete reconstruction "would do more to distract from than to clarify the court's holding."). In such circumstances, the court should identify the particular evidence to be inserted or deleted and specify where those alterations belong. *Id.*

Paragraph 8:

In July 2022, BYRD, along with accomplices, asked [P.A.] whom they believed worked for FedEx Express, if he could help them obtain a package off of a FedEx truck. [P.A.] told BYRD he could, although FedEx Express had terminated his employment. ***P.A. had twice been fired for stealing packaged to support his drug addiction.*** [P.A.] told BYRD to have the package sent to Temple Hospital.

Paragraph 17:

[P.A.] was identified by J.H. and FedEx supervisor D.J. as the individual who contacted J.H. in an attempt to intercept the package. [P.A.] was subsequently arrested by Philadelphia police ***on August 10. In an interview with Philadelphia police officers that night, he falsely told police that he knew the gunman as "Ty." He also told the officers that he was unable to identify the driver of the Jeep Trackhawk and that he had "never seen" that individual before and that he "wasn't paying attention to him."*** [P.A.] ***later*** began cooperating with investigators and ***was interviewed by Philadelphia Police officers on September 23, 2022. In that proffer, P.A. discussed his involvement in the robbery/carjacking of the FedEx truck and implicated males he knows as "Bird" and "Pop." P.A. admitted "Bird" was the man he referred to as "Ty" on the night of his arrest. He also stated that "Bird" was driving the black Jeep with "Pop" in the front passenger seat and P.A. saw the FedEx truck leave Temple with "Bird" and "Pop" following in the Jeep.*** [P.A.] identified BYRD as the individual seen in the FedEx truck surveillance video who carjacked the FedEx truck. He also further explained that he was in contact with BYRD on his personal cell phone and with other individuals working with BYRD using the "burner" cell phone they provide prior to, during, and after the carjacking. ***P.A. was also interviewed on October 21, 2022. Although a Detective's notes from that interview indicate that "Byrd and Pop [were] together in the Trackhawk," P.A. clarified that he did not know who was driving the Trackhawk and could not describe him. P.A. later testified in Grand Jury consistent with that statement—he did not know who was driving the Trackhawk.***

Paragraph 20:

In a proffer with investigators in April 2023, [P.A.] was shown the picture identified as Figure 1 above. [P.A.] told investigators that, ***notwithstanding his failure to recognize the driver of the Trackhawk,*** the masked individual in the yellow shirt looked like a person he knows as "SK." Investigators showed [P.A.] a single image of Saikeen DIXON and [P.A.] indicated that DIXON was the person he knew as "SK." ***Investigators did not ask how P.A. knew SK or for how long they had been acquainted.*** In subsequent discussions, [P.A.] identified DIXON's Instagram account for investigators, which is associated with the handle (or display name) "dolo.sk". Based on available photos of DIXON from his Instagram account and from public records, including his Pennsylvania driver's license photo, the individual in Figure 1 that [P.A.] identified as DIXON shares the same physical traits as DIXON, including the same height, weight, build, skin tone, and head shape, and both have a distinctive scar on their right arm.

Paragraph 21:

> Pursuant to a search warrant signed on May 16, 2023 by the Honorable Lynne A. Sitarski, investigators obtained iCloud backup data associated with two accounts controlled by BYRD. . . That data indicated that at approximately 10:19 a.m. on August 10, 2022—about an hour before the carjacking—BYRD sent a message containing his location to [a phone number] which was saved in his contacts as "Kil." The location data contained in the message indicated that BYRD was at Temple Hospital. ***There was no reply to that text message.*** As mentioned above [P.A.] previously explained to investigators that BYRD was at Temple Hospital on the day of the carjacking when [P.A.] was trying to obtain the package form the FedEx truck. [P.A.] told investigators that BYRD initially arrived at Temple Hospital driving a black Jeep Grand Cherokee, but after J.H. refused to give [P.A.] the package, BYRD told [P.A.] that his "young boul" was about to pull up in a "Johnny"—i.e., a stolen car—and BRYD returned a few minutes later in a black Jeep Grand Cherokee Trackhawk being driven by another person. Taken together, this evidence indicates that the contact BYRD saved as "Kil" is the driver of the Trackhawk used in the carjacking.

Paragraph 23:

> Pursuant to a search warrant signed on August 21, 2023 by the Honorable Lynne A. Sitarski, investigators obtained cell-site data for DIXON's phone number . . . The data indicated that DIXON***'s phone*** was at Temple Hospital shortly after BYRD sent the message with his location—i.e., shortly before the carjacking. ***However, Dixon lives about around 3/4 of a mile from that location and may have an innocent explanation for his presence near Temple Hospital.***

Yet, even with all of this omitted information supplied, the reconstructed affidavit provides a substantial basis to find probable cause that Dixon was the Trackhawk driver and participated in the carjacking. To be sure, the "omissions" somewhat weaken P.A.'s credibility and the force of his identification. But probable cause does not require an unimpeachable witness. *See Dempsey*, 834 F.3d at 477-78 (explaining that some "unreliability or exculpatory evidence" will not "fatally undermine[]" probable cause otherwise established). Nor can those facts be considered in isolation, because probable cause turns on the cumulative weight of the evidence and the reasonable inferences that follow from it. *Yusuf*, 461 F.3d at 390-91. Here, P.A.'s identification is just one piece of the evidence supporting probable cause and the reconstructed affidavit identifies multiple, mutually reinforcing connections to Dixon. Probable

cause requires only a "fair probability," not certainty or proof beyond a reasonable doubt*, id.* at 390, and considered in its totality, the reconstructed affidavit satisfies that standard.[10]

***

Because Dixon failed to meet his burden and establish, by a preponderance of evidence, that Agent Donahue had the requisite state of mind, or that inclusion of the omitted facts undermined the finding of probable cause, his Motion to Suppress Evidence shall be denied.

**BY THE COURT:**

s/ Wendy Beetlestone

**WENDY BEETLESTONE, C.J.**

[10] Dixon further contends that the good faith doctrine would not apply to shield the fruits of the search from suppression because the magistrate judge issued the warrant based on a deliberately or recklessly false affidavit. *See Virgin Islands v. John*, 654 F.3d 412, 418 (3d Cir. 2011). But having already examined Agent Donahue's state of mind and finding it neither deliberately deceitful nor reckless—and having found that even a reconstructed affidavit supports a finding of probable cause—there is no need to repeat the analysis in the context of the good faith doctrine, and the inquiry can end here.